# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 5, 2004

## STATE OF TENNESSEE v. PATRICK HARRIS

**Appeal from the Criminal Court for Shelby County**
**No. 03-01420    Bernie Weinman, Judge**

---

### No. W2004-00469-CCA-R3-CD  - Filed February 28, 2005

---

The defendant, Patrick Harris, was convicted by a Shelby County jury of first degree murder. In this appeal, he insists that he acted in self-defense and that the evidence is legally insufficient to support his conviction. Finding that the evidence is sufficient and that it entitled the jury to reject the defendant's claim of self-defense, we affirm the defendant's conviction.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and DAVID G. HAYES, JJ., joined.

Robert Wilson Jones, District Public Defender; W. Mark Ward, Assistant District Public Defender (on appeal); and Kindle Nance and Karen Massey, Assistant District Public Defenders (at trial), for the Appellant, Patrick Harris.

Paul G. Summers, Attorney General & Reporter; Seth P. Kestner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jerry Harris and Paul Hagerman, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

This case involves the June 8, 2002 death of Lavon Armstrong who was shot in the front yard of his residence located in south Memphis at 728 Lucy Street. The defendant was arrested, tried for, and convicted of first degree premeditated murder. The defendant admitted to firing the fatal shot but claimed that he acted in self-defense and in defense of his mother.

The evidence at trial, taken in the light most favorable to the state, showed that the victim, who was 24 years old at the time of his death, lived with his cousin, Lacey Armstrong, and her two sons, Eddie and Laquavious Armstrong. Ms. Armstrong last saw the victim between 11:00 a.m. and noon on June 8, as she was leaving to attend a baby shower. The victim, Ms. Armstrong's

sons, and another cousin remained at the house. Later that same day, Ms. Armstrong received notice that the victim had been shot and that her son, Eddie Armstrong, had been injured.

The defendant's mother, Earma Harris, testified that she lived nearby at 713 Lucy Street with her son and her daughter, Monica Conley. Monica Conley had dated the victim. On June 8, around noon, Ms. Harris was at Carter's Fish Market; the defendant and a female companion, Latasha Jenkins, brought keys to Ms. Harris. The defendant mentioned that he and the victim "had been into it," which concerned Ms. Harris. The defendant would not explain his remark other than to suggest that his mother "ask Monica." The defendant expressed concern for Ms. Harris' welfare and warned her that people on the porch were "going to shoot up the house."

Later that same afternoon, Ms. Harris was in front of the Armstrong residence talking to the victim. The defendant walked up behind her and told her to go home. She told the defendant to leave, but he again told her to go home. Ms. Harris testified that she "tussled with him, and he kind of threw [her], and then he shot [the victim]." Ms. Harris recalled seeing the gun in the defendant's hand, heard the shot, and saw the victim fall onto the sidewalk. The people on the porch ran behind the house. Ms. Harris did not see a weapon either on the victim or on anyone who had been on the porch.

Ms. Harris was quite emotional. Her sister and others escorted Ms. Harris to her house. Ms. Harris did not know the defendant's whereabouts. When police officers arrived to investigate, Ms. Harris told them what happened and gave a statement. The defendant never contacted Ms. Harris, and she had no contact with him until he was arrested.

On cross-examination, Ms. Harris admitted that she previously had problems with the victim, who also was the father of her daughter's child. The victim had been so disrespectful that Ms. Harris once summoned police officers to escort her daughter from the residence. After her daughter was out of the house, Ms. Harris had no further problems with the victim. Ms. Harris had discussed with the defendant the problems she had encountered with the victim. Ms. Harris agreed that the defendant was "very protective" toward her, and she believed that the defendant was trying to protect her the day of the shooting.

Dr. Cynthia Gardner testified that she performed the autopsy on the victim. The victim died from multiple gunshot wounds, including two bullets that entered the rear of the head. Two bullets entered the left side of the neck and exited the front of the neck, and the trajectory of two other neck wounds was from front to back. Three additional wounds had chest entry points. In all, Dr. Gardner located 13 individual wound tracks.

Memphis Patrol Officer Derrick Blake responded to the scene of the shooting at approximately 1:30 to 1:40 p.m. He discovered the victim's body, riddled with bullet holes, on the walkway with the head facing toward the house. No weapons were in the area. Officer Blake believed the victim was still breathing at the time. He interviewed Ms. Harris, who was cooperative and provided the defendant's name as a suspect. Officer Blake issued a broadcast for the defendant.

-2-

Sergeant Cynthia Donahue with the Des Moines Police Department arrested the defendant on February 25, 2003, in Des Moines, Iowa. At that time, the defendant identified himself as Mario Brown. Later, he did provide his correct name and told the officer that he "was wanted out of Tennessee for murder."

Larry Wing was present at 728 Lucy Street when the shooting occurred. Mr. Wing lived at the residence with Ms. Armstrong. He testified that Ms. Armstrong's sons and several of the sons' friends were sitting on the porch. Mr. Wing was inside the house preparing to go to work, and when he left the house, he walked to the truck parked in front of the residence. The driver of the truck worked with Mr. Wing, and he told Mr. Wing that a man had a gun. When Mr. Wing turned around, he saw the defendant shooting at the victim. The victim was standing in the yard and then fell to the ground. Mr. Wing saw and heard the defendant shoot at the victim multiple times.

Mr. Wing testified that when he came out of the house, he noticed Ms. Harris standing outside the gate talking to the victim. He did not detect any loud voices, and he did not see any weapons other than the defendant's firearm. Through cross-examination, the defense established that Mr. Wing could not identify the shooter when he was questioned by the police. Mr. Wing explained at trial that his back was to the porch when the driver alerted him about the man with a gun. When Mr. Wing turned around, he saw the shooter's back. As the shooter continued firing, Mr. Wing began backing up, and when the shooter turned to leave, Mr. Wing went across the street.

Laquavious Armstrong, who also was present at the time of the shooting, testified that he, Tony Redmond, Lavon Armstrong, Eddie Armstrong, and Kevin Farmer had been sitting on the porch "smoking a little marijuana." The defendant walked up and asked the victim for a ride. When the victim declined, the defendant got "mad," the men had a "few words," and the defendant left. Laquavious Armstrong next saw the defendant and the defendant's girlfriend circle the block in a truck a couple of times. The defendant waved a gun out of the truck window. The third time the truck came around the block the defendant was not inside riding.

Laquavious Armstrong said he spotted the defendant on the side of the house, but before anything could happen, the defendant's mother arrived. The defendant spoke to his mother, after which his mother walked toward the porch and "called [the victim] out to the gate." The defendant's mother wanted to know why the two men were arguing, and the victim explained that the argument related to a car. Laquavious Armstrong overheard the defendant's mother remark, "[W]ell, he can't get mad over nothing that ain't his." Laquavious Armstrong never observed the victim being disrespectful to Ms. Harris; nor did he observe any weapons on the victim or anyone else on the porch.

Laquavious Armstrong then described what happened when the defendant walked up to Ms. Harris.

A      Well, when he got up there, he was like, "Momma, get away from those bitch-ass n******. I'm fixing to kill this n*****," you know what I'm saying, like that there.

Q      Who said that?

A      That's what Patrick said.

Q      All right.

A      And so his momma was like, "No, go on to the house go on to the house." She grabbed him by the arm. He broke loose and just lunged out, just wide out.

Q      Then what happened?

A      After she tried to hold his arm, he broke loose from her and ran up on LaVon and shot him two times. He fell . . . .

. . . .

Q      All right. Once he fell on the ground, what did Mr. Patrick Harris do?

A      Well, Mr. Harris he walked up over him and stood over on him and just kept on shooting. By then, you know, I'm running for my life.

On cross-examination, Laquavious Armstrong admitted that he joined in the verbal fray after the defendant walked up and told his mother to leave.

After Laquavious Armstrong's testimony, the state rested. The defense called LaShaun Lee, who lived next door to Earma Harris at the time of the shooting. Prior to the shooting, Ms. Lee had an occasion to witness a confrontation between the victim and Ms. Harris. Ms. Lee testified that the victim was being disrespectful to Ms. Harris.

Ms. Lee was present on June 8 and saw the defendant walk up to his mother, who was talking to the victim. Ms. Lee denied that the defendant tried to pull his mother away from the victim's house; rather, Ms. Lee saw Ms. Harris trying to pull the defendant back from the victim and telling him to come back toward their house. On cross-examination, Ms. Lee testified that she saw the defendant shoot the victim. She claimed that her memory of the specifics of the shooting was vague, however, because she wanted to get away from the gunfire.

The defendant took the stand, and he began his testimony by acknowledging that he had previously pleaded guilty to two prior drug offenses, two felony theft offenses, and robbery. Regarding the offense on trial, the defendant said that earlier in the day he became concerned for his mother's safety because of threats to "shoot up" her house and shoot her. When he went to check on his mother, he saw her down the street talking to the victim; the defendant claimed that the pair appeared to be arguing. The defendant testified that his "reason for going down the street was to tell [his] mom to come back home to her house." He even pulled on her to get her moving.

The defendant admitted shooting the victim. He explained his actions in the following terms:

> What made me pull my weapon out was guy by the name Antonio Redmond, he pulled his weapon first, and the first shot came from the porch, which I pointed my weapon, and I was in the street behind the truck . . . , me and my mom, and once he pointed his weapon, I mean, it was a heated argument, which Eddie started and Laquavious joined in, and [the victim] walked toward the porch and when he came off the porch -- I mean when they pointed their weapon at me, I took my weapon out of my waist, and when the shot went off, I had pushed my mom in fear that she would be shot.

The defendant said that his firearm held six shell casings, and he fired all six bullets. He then ran off to escape the "mess of gunfire."

On cross-examination, the state closely questioned the defendant to identify the source of the conflict with the victim. Because the defendant had told his mother at the fish market that he and the victim "had been into it," the state wanted the defendant to elaborate. The defendant denied that he argued with the victim about an automobile. He gave a somewhat rambling account to the effect that after the victim declined to drive the defendant home, the defendant called his sister and asked her to call and tell the victim that he should allow the defendant to borrow the car briefly to drive home and change clothes. When the defendant again called his sister to check on her progress, she advised that no one had answered the telephone when she tried to reach the victim. The defendant told his sister that the victim and the victim's cousin were standing on the house porch. The defendant said that he told his sister not to "worry about it," because he would call his "baby's momma" and arrange for transportation.

According to the defendant, he then walked to the store, and on his way back from the store, the victim ran out of the house. The defendant pinpointed that moment as the beginning of the altercation. He testified that the victim started screaming, "[W]hat the 'F' you mean you going to get at me and what you done told your sister." At some point, some of the other people on the porch "joined in," and the defendant said that he told the victim that he was going to call his child's mother to get a ride.

-5-

As for the firearm, the defendant testified that he had been carrying it all the time, even though he knew it was illegal because he is a convicted felon. He denied, however, waving a gun outside the truck window as he and his girlfriend drove along Lucy Street. The defendant admitted shooting the victim but denied firing at the back of the victim's head. The defendant surmised that the men shooting from the porch hit the victim from behind. The defendant also disputed the witness testimony that he stood over the victim and fired shots after the victim had fallen to the ground.

Based on the foregoing testimony, the jury found the defendant guilty of first degree murder. Because the state had filed a notice seeking a sentence of life without the possibility of parole, *see* Tenn. Code Ann. § 39-13-208(b) (2003), the jury remained empaneled to hear and decide the issue of punishment. The jury set punishment at imprisonment for life, with the possibility of parole.

Aggrieved by his conviction, the defendant has appealed. He assails the sufficiency of the evidence to support his conviction in terms of the offense element of "premeditation," and he argues that the jury improperly rejected his claim of self-defense.[1] The state disagrees, emphasizing the province of the jury to decide matters of credibility. Our review of the record convinces us that the defendant's conviction is not legally infirm.

When an accused challenges the sufficiency of the evidence, an appellate court inspects the evidentiary landscape, including the direct and circumstantial contours, from the vantage point most agreeable to the prosecution. *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979). The reviewing court then decides whether the evidence and the inferences that flow therefrom permit any rational factfinder to conclude beyond a reasonable doubt that the defendant is guilty of the charged crime. *See* Tenn. R. App. P. 13(e); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992).

In determining sufficiency of the proof, the appellate court does not replay and reweigh the evidence. *See State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Witness credibility, the weight and value of the evidence, and factual disputes are entrusted to the finder of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). Simply stated, the court will not substitute its judgment for that of the trier of fact. Instead, the court extends to the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences that may be drawn from the evidence. *See Cabbage*, 571 S.W.2d at 835.

---

[1] We note that the record fails to include a transcript of the instructions as read to the jury, although it contains what purports to be a written copy of the trial court's charge. From the written charge, we discern that the trial court did charge the jury on the defendant's claim of self-defense and defense of another.

First degree murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation "is an act done after the exercise of reflection and judgment. 'Premeditation' means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." *Id*. § 39-13-202(d) (2003). Intentional "refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id*. § 39-11-302(a) (2003). The existence of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. *See State v. Rosa*, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999); *State v. Gentry*, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993).

The defendant concedes that evidence exists in the record "which, if believed, relates to the issue of premeditation." That concession is well taken, particularly in light of Laquavious Armstrong's testimony that the defendant threatened to kill the victim, that the defendant had been waving a gun outside the truck window, and that the defendant used a deadly weapon upon an unarmed victim. As we understand the defendant's argument, he essentially blends his self-defense theory and his premeditation and self-defense evidence insufficiency complaint into an argument that the state did not disprove beyond a reasonable doubt that he acted in self-defense. Accordingly, we turn our attention directly to the questions of self-defense and evidence sufficiency.

Self-defense is categorized as a statutory "justification" excluding criminal responsibility. Tenn. Code Ann. § 39-11-601 (2003) ("It is a defense to prosecution that the conduct of the person is justified under this part."). Accordingly, and also by statute, "If the issue of the existence of a defense [such as self-defense] is submitted to the jury, the court shall instruct the jury that any reasonable doubt on the issue requires the defendant to be acquitted." *Id*. § 39-11-203(d) (2003). In other words, the state has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *See State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001); *State v. Belser*, 945 S.W.2d 776, 781-83 (Tenn. Crim. App. 1996).

Code section 39-11-611 governs self-defense; it provides,

(a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is

-7-

presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

(c) The threat or use of force against another is not justified if the person consented to the exact force used or attempted by the other individual.

(d) The threat or use of force against another is not justified if the person provoked the other individual's use or attempted use of unlawful force, unless:

(1) The person abandons the encounter or clearly communicates to the other the intent to do so; and

(2) The other nevertheless continues or attempts to use unlawful force against the person.

(e) The threat or use of force against another is not justified to resist a halt at a roadblock, arrest, search, or stop and frisk that the person knows is being made by a law enforcement officer, unless:

(1) The law enforcement officer uses or attempts to use greater force than necessary to make the arrest, search, stop and frisk, or halt; and

(2) The person reasonably believes that the force is immediately necessary to protect against the law enforcement officer's use or attempted use of greater force than necessary.

Tenn. Code Ann. § 39-11-611 (2003).

The defendant argues that the proof shows that he was engaged in a heated argument when one of the men on the porch pulled and fired his weapon before the defendant returned fire. He points to the number of gunshot wounds that the victim sustained versus the number of bullets that his gun would hold as demonstrating that the people on the porch were exchanging gunshot fire with him.

There is, however, abundant evidence in this record, which the jury obviously accredited, that the defendant was the initial aggressor and fired without justifiable provocation. Even so, whether the men on the porch fired at or in the direction of the defendant is not dispositive. As seen in subsection (d) of 39-11-611, "[t]he threat or use of force against another is not justified if the person *provoked* the other individual's use or attempted use of unlawful force." *See id.* § 39-11-611(d) (2003), Sentencing Comm'n Comments ("Subsection (d) also restricts the defense by codifying the traditional concept of the initial aggressor. In order to use the defense, the initial aggressor must withdraw or communicate an intent to withdraw and the force must continue despite this communication."). Whether, under those circumstances, anyone else returned fire is legally inconsequential unless the evidence also showed that the initial aggressor "abandon[ed] the encounter." Furthermore, there is no evidence in the record that the victim – as opposed to other men on the porch – posed any imminent threat or danger to the defendant that justified the defendant's use of deadly force against the victim. It was the distinctive province of the jury to find from the evidence in this record that the defendant was either the sole or the initial aggressor, did not legally "abandon" the encounter, and did not shoot the victim in self-defense. *See State v. Michael Raines*, No. E2001-00996-CCA-R3-CD (Tenn. Crim. App., Knoxville, Apr. 17, 2002) (rational trier of fact could have rejected defendant's claim of self-defense or that he was adequately provoked to behave irrationally). This court, therefore, concludes that the evidence at trial justified the jury's rejection of the defendant's claim of self-defense and that the evidence is legally sufficient to support the defendant's conviction for first degree murder.

_____
JAMES CURWOOD WITT, JR., JUDGE